IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)

| | | |
|---|---|---|
| DOW JONES & COMPANY, INC.<br>1211 Avenue of the Americas<br>New York, NY 10036 | : | CASE NO. 3:26-cv-00385 |
| | : | (Judge ____________) |
| Plaintiff, | : | |
| | | **COMPLAINT** |
| v. | : | |
| | | **(with Demand for Jury Trial)** |
| BRADSTREET & COMPANY, INC.<br>388 Regency Ridge Dr.<br>Dayton, OH 45459 | : | |
| | : | |
| and | : | |
| MARK BRADSTREET<br>1924 Amy Ridge Ct.<br>Beavercreek, OH 45434 | : | |
| | : | |
| Defendants. | : | |

---

For its Complaint against Defendant Bradstreet & Company, Inc. ("Bradstreet & Co.") and Mark Bradstreet ("Mr. Bradstreet") (collectively, "Defendants"), Plaintiff Dow Jones & Company, Inc. ("Dow Jones") states as follows:

1. This case arises out of Defendants' systematic, verbatim, and willful copying and distribution of many of Dow Jones's original works for Defendants' own commercial benefit, in violation of the Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. § 101 et seq.

2. Dow Jones has a long and distinguished history of reporting the news and is among the best-known news publishers in the world. Through its flagship publication, The Wall Street Journal, Dow Jones provides accurate, timely, and highly valuable business news

information to millions of paying subscribers and other readers throughout the United States and around the world. In order to provide its subscribers and readers with such journalism, Dow Jones dedicates immense resources to investigating, reporting, and publishing the news every day. And, given the exceedingly competitive news industry in which The Wall Street Journal operates, Dow Jones heavily invests in its worldwide network of news bureaus and highly skilled professional journalists in order to remain an industry leader.

3. The Wall Street Journal features original news articles consisting of text, images, graphs, charts, timelines, and other copyrighted materials created and owned by Dow Jones (collectively, "Dow Jones's Copyrighted Works"). Dow Jones regularly registers its Copyrighted Works with the U.S. Copyright Office. True and accurate copies of certain of Dow Jones's unique relevant Certificates of Registration are attached as **Exhibit A**.

4. The high-quality journalism provided by Dow Jones in The Wall Street Journal is supported in part by licensing fees along with paid print and digital subscriptions. Without control over the distribution of its journalism, Dow Jones would be unable to maintain its worldwide news-reporting network and related operations. Accordingly, Dow Jones is reliant on the copyright protection it actively works to secure.

5. Dow Jones serves as the exclusive distributor of its original journalism with only a few exceptions for certain carefully-selected third parties that distribute such content for a fee commensurate with its value. Dow Jones also vigilantly oversees the channels by which its journalism is distributed; such oversight adds significant value to Dow Jones's products and services. These activities further support Dow Jones's continuing ability to investigate, report, and publish the news commensurate with the level of quality its subscribers and readers

have rightfully come to expect.

6. Unauthorized republication of Dow Jones's Copyrighted Works undermines its business model and injures Dow Jones. Infringement of Dow Jones's Copyrighted Works, through unauthorized republication, directly interferes with Dow Jones's control of the dissemination of its journalism and reduces the value of that journalism to legitimate licensees and individual consumers. The injury is compounded when, as here, the infringer claims authorship of Dow Jones's journalism and exploits the works to market and promote its own commercial services.

7. Bradstreet & Co. is a firm owned by Mr. Bradstreet, a certified public accountant, that provides its clients with accounting, bookkeeping, consulting, cryptocurrency, estate planning, payroll processing, start-up, tax, valuation, and other professional business services through its team of professionals in two Ohio locations: Dayton, Ohio, and Xenia, Ohio.

8. Between at least May 2019 and March 2026, Defendants willfully reproduced many of Dow Jones's Copyrighted Works, in full, without permission or a license from Dow Jones and distributed those illegal copies on Bradstreet & Co.'s website, social media accounts, email listservs, and MailChimp archive ("Online Platforms") to Bradstreet & Co.'s past, present, and prospective clients, affiliates, and any other members of the public.

9. Defendants did not just reproduce Dow Jones's original journalism; they also repackaged it as Bradstreet & Co.'s own expert guidance in order to attract clients and promote its services designating Mr. Bradstreet (or occasionally other Bradstreet & Co. employees) as "This Week's Author" and displaying it in a series called "Tax Tip of the Week," alongside advertisements for Bradstreet & Co.'s tax planning meetings, training, and webinars.

10. Upon information and belief, Mr. Bradstreet personally directed this process by using his paid WSJ.com subscription to access Dow Jones's Copyrighted Works behind The Wall Street Journal's paywall, copying the full text of those articles, and republishing them under his own name on Bradstreet & Co.'s platforms to promote Bradstreet & Co.'s professional services.

11. Defendants undertook such action without Dow Jones's authorization, consent, or knowledge, and without providing any compensation to Dow Jones.

12. A non-exhaustive list of Dow Jones's Copyrighted Works known to have been reproduced without permission or license by Defendants is attached as **Exhibit B**.

13. Dow Jones does not presently know all of the means by which Defendants obtained, reproduced, and distributed Dow Jones's Copyrighted Works. Upon information and belief, Defendants obtained the text of the reproduced articles directly or indirectly from websites operated by Dow Jones, including The Wall Street Journal's own website at WSJ.com, accessed through Mr. Bradstreet's subscription plan.

14. Dow Jones seeks actual damages suffered as a result of Defendants' infringement, together with any profits of Bradstreet & Co. attributable to the infringement that are not otherwise taken into account in calculating Dow Jones's actual damages.

15. In the alternative, if Dow Jones elects to do so, Dow Jones is entitled to statutory damages for Defendants' willful infringement.

16. Dow Jones also seeks injunctive relief, attorneys' fees, and costs as provided by the Copyright Act.

## PARTIES

17. Plaintiff Dow Jones is a Delaware corporation with its principal place of business located at 1211 Avenue of the Americas, New York, New York.

18. Defendant Bradstreet & Company, Inc. is an Ohio corporation with its principal place of business located at 388 Regency Ridge Dr., Dayton, Ohio.

19. Defendant Mark Bradstreet is Bradstreet & Co.'s founder and owner. Upon information and belief, Mark Bradstreet is an individual with a residence in Beavercreek, Ohio. Upon information and belief, Mark Bradstreet had the authority to control Bradstreet & Co. with respect to Dow Jones's Copyrighted Works, and directed and participated in, had knowledge of, and received a financial benefit from, the conduct alleged herein.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (establishing federal subject-matter jurisdiction for all claims arising under federal laws, such as the Copyright Act) and 1338(a) (establishing original jurisdiction for all claims relating to copyrights, patents, and trademarks).

21. This Court has personal jurisdiction over Defendants as Defendants have engaged in the at-issue conduct within this District in which (1) Bradstreet & Co. maintains its principal place of business and under the laws of which it is organized and (2) Mr. Bradstreet is a resident.

22. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b), (c), and (d), and 28 U.S.C. § 1400(a), because Defendants reside within this district, a substantial

part of the events or omissions giving rise to Dow Jones's claim occurred in this district, and because Defendants are subject to personal jurisdiction in this district.

## BACKGROUND

### *Dow Jones's Established Business and Copyrighted Works*

23. In 1882, Dow Jones began as a small news agency in a Wall Street basement, founded by reporters Charles Dow, Edward Jones, and Charles Bergstresser. Publishing the first edition of The Wall Street Journal in July 1889, Dow Jones has now expanded into a worldwide leader in financial and business news reporting and publishing. Today, Dow Jones creates and distributes some of the most widely recognized and reputable publications in the news industry, including, in addition to The Wall Street Journal, Dow Jones Newswires, MarketWatch, Financial News, and Barron's.

24. The Wall Street Journal is Dow Jones's flagship publication. Founded in 1889, The Wall Street Journal is today one of the largest national daily newspapers in the United States, with a combined print and digital circulation of over 4.8 million subscribers. Dow Jones sells the daily print edition of The Wall Street Journal on an individual-copy basis (e.g., at newsstands), as well as on a subscription basis. Additionally, The Wall Street Journal's online website, WSJ.com, has one of the largest paid subscriber bases of any news site on the Internet.

25. Dow Jones's Copyrighted Works include The Wall Street Journal's news articles and opinion pieces, which are regularly registered with the U.S. Copyright Office. See, e.g., Ex. A.

26. Dow Jones's global journalistic operation is funded by, among other things, licensing fees and paid subscriptions. Revenues from licensing fees and paid

subscriptions are used to cover the significant costs of maintaining Dow Jones's talented staff, extensive and widespread newsgathering process, and large distribution infrastructure.

27. Dow Jones also licenses reprint rights to journalism from The Wall Street Journal on a per-article basis. As a result, each of the news articles, opinion columns, and other original items that appear each day in The Wall Street Journal has its own independent economic value. Dow Jones's licensing information, terms, and prices are available publicly at https://www.djreprints.com/, and a copy of Dow Jones's Terms associated with certain reprint types is attached as **Exhibit C**.

28. Dow Jones notifies the public of the licensing requirements by including an explicit warning (an excerpt reproduced below) at the top of its digital content when such content is printed from its websites: "This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com." See, e.g., Ex. E.

8/14/26, 11:09 AM The Hardest Part About Being a Billionaire in California: Proving You Left - WSJ

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/lifestyle/california-billionaire-tax-income-6d48e22c

29. Dow Jones also includes a copyright notice at the bottom of each page of its website, including each article page, which states: "Copyright ©2026 Dow Jones & Company, Inc. All Rights Reserved." The year reflected in the notice is updated annually and has appeared in substantially similar form throughout the period of Defendants' infringement.

30. Paid digital subscribers have complete access to Dow Jones's Copyrighted

Works on WSJ.com, but do not have the right to republish those articles. Subject to limited exceptions, non-subscribers are generally prohibited from accessing full-text content on WSJ.com.

31. Digital subscribers to WSJ.com are required to agree to Dow Jones's relevant Terms of Use (hereinafter, "WSJ Terms of Use"). The WSJ Terms of Use further provide that any person who accesses or uses a Service, with or without an active subscription or registration, is subject to all applicable terms and conditions, including the restrictions on use and distribution of content set forth in Section 8. For example, and without limitation, a true and accurate copy of the relevant WSJ Terms of Use in effect at the time of Defendants' subscription is attached as **Exhibit D**.[1]

***Defendants' Actions and Willful Infringement of Dow Jones's Copyrighted Works***

32. From its principal place of business in Dayton, Ohio, Bradstreet & Co. provides its clients with accounting, bookkeeping, consulting, cryptocurrency, estate planning, payroll processing, start-up, tax, valuation, and other professional business services. In connection with the provision of such services, Bradstreet & Co. owns and operates a website available at https://www.bradstreetcpas.com/.

33. Through its website, Bradstreet & Co. regularly posted news-related articles and information directed to its past, present, and prospective clients, affiliates, and any other members of the public who navigate to its publicly available website. As illustrated in the example webpage captures reproduced below, during the time period relevant to this action,

[1] Also available online at https://www.dowjones.com/terms-of-use/.

Bradstreet & Co. has posted such articles to both the "Latest Tax Tips" section of its homepage (https://www.bradstreetcpas.com/) and to other portions of its website it refers to as "Tax Tips" or "the Blog" (https://www.bradstreetcpas.com/blog).




**Screen Capture of the "Latest Tax Tips" Section of Bradstreet & Co.'s Homepage**
(https://web.archive.org/web/20260109194034/https://www.bradstreetcpas.com/)
*Captured via web.archive.org on January 9, 2026*




**Screen Capture of the "Tax Tips" or "Blog" Portion of Bradstreet & Co.'s Website**
(https://web.archive.org/web/20260109194256/https://www.bradstreetcpas.com/blog)
*Captured via web.archive.org on January 9, 2026*

34. Bradstreet & Co.'s website is publicly accessible to anyone with an internet connection, without requiring any login, subscription, or payment. Upon information and belief, Defendants reproduced Dow Jones's Copyrighted Works in their entirety on the website, presenting them under Bradstreet & Co.'s own branding and alongside advertisements for Bradstreet & Co.'s professional services. The website's "Latest Tax Tips" and "Blog" sections served as a repository of reproduced Dow Jones articles on topics directly relevant to Bradstreet & Co.'s accounting, tax, and financial advisory practice, including tax planning, retirement savings, estate planning, IRS enforcement, Social Security, and wealth management.

35. By making Dow Jones's Copyrighted Works freely and publicly available on its website, Bradstreet & Co. provided its past, present, and prospective clients, and any other members of the public, with access to the same high-quality journalism that Dow Jones offers only through paid subscriptions and authorized licensing arrangements. Visitors to Bradstreet &

Co.'s website could read the full text of Dow Jones's Copyrighted Works without paying for a Wall Street Journal subscription or otherwise compensating Dow Jones, as illustrated in the example webpage captures reproduced below.

# Christmas Gifts and an RV: Workers Push It With Company Cards

Company credit card | Fraud | February 5, 2025




This Week's Quote: "Every moment is a fresh beginning."
- T.S. Eliot

Did you hear the one about the employee who booked a cruise on the company credit card? Or the guy who tried to expense a couple of Jet Skis?

We've all heard about people who fudge their expenses, but some of them belong in an Expense Account Shenanigans Hall of Fame.

James Tomes sometimes tells his employees to treat themselves and their spouses to dinner on the company dime after a week of business travel. The president and chief executive of Telgian, a fire-protection consulting and engineering firm, says he tries to be a generous boss, though some employees have still tried to take advantage. A few put date nights on the corporate tab without asking, but one case of taking liberties stands out.

"One guy bought his whole family's Christmas presents with the company credit card," says Tomes, who fired the employee over the $2,500 bill. "He said he traveled a lot and the company owed this to him."

Santa Claus is making a list and checking it twice, but this is the time of year when overwhelmed accounting departments can miss some tricks as they race to close the books at year-end. Awash in receipts, finance teams "kind of push things through as quickly as possible," as the year draws to a close, says Sarah-Jayne Martin, a director at financial-automation and business-software company Quadient.

For the less scrupulous among us, December can be "a perfect time to submit something where there might be fraudulent activity," she says.

Once an exclusive perk, corporate cards are in the hands of more workers these days, says Katie MacKillop, U.S. director of Payhawk, which works with companies like American Express to administer company credit-card programs.

**Brazen abuses**

Expense fraud costs businesses an estimated 5% of revenue on average and appears to be on the rise, according to the Association of Certified Fraud Examiners. The industry group says it's possible companies simply catch more fraud than they used to, thanks to smarter software. Then again, artificial-intelligence tools make doctoring receipts easier than ever.

Martin says her firm's clients have uncovered brazen abuses, including romantic getaways booked with a company card. In that case, an employee picked vacation

Then there was the man who discovered a certain strip club was categorized as a restaurant by his corporate-card issuer. He would use his company card at the club and submit the expense as a business dinner, Martin says.

Bogus expenses are often so small that they don't hurt a company's overall health, but some can, says Tomes. When his business was young, in the early 1990s, he discovered a bookkeeper had fabricated roughly $50,000 of invoices for phony janitorial, furniture and consulting services and pocketed the money. Worse, some legitimate invoices hadn't been paid. It took months to dig out of the hole, with Tomes temporarily foregoing his salary to help repair the budget.

Dishonest employees are rare, he says, but now he takes no chances. Expenses at his company go through three layers of review. Even small businesses trying to limit costs should pay for at least two sets of eyes, he suggests, because the price of fraud can be higher than the accounting bill.

**Dubious honor**

For finance types, rooting out expense fraud is like a sport. At SAP, maker of the expense-reporting software Concur, auditors vie for unofficial quarterly awards for exposing the most outlandish charges.

One employee of an SAP client put his $1,659 monthly mortgage on the company tab. He got away with it for several months by disguising his lender as a business vendor.

Someone at another company tried to purchase an RV with a corporate card, according to SAP. On the road for a six-month assignment, he contended the motor home would be cheaper than hotels. The transaction was declined.

Employees of several SAP clients have expensed makeup, arguing their client-facing roles require them to look their best. One went further and tried to bill her employer for plastic surgery.

The pandemic spawned new kinds of expense-account abuse, according to SAP. Home-office allowances were sometimes funneled to unrelated home-improvement projects. One man who used to work in an office with free coffee figured he could bill his company for a daily Starbucks run—even requesting mileage reimbursements for driving to and from the coffee shop.

We gasp or laugh at others' gall, but plenty of us might be guilty too. About 15% of submitted expenses don't comply with corporate policies, according to SAP. Honest mistakes, like typos and accidentally blowing past spending limits as the cost of dining soars, account for many of those errors, says Chris Juneau, senior vice president and head of product marketing for SAP Concur. Still, 65% of business travelers in a 2022 SAP survey admitted to intentionally slipping personal expenses onto the company dime.

**Damage done**

The Jacksonville Jaguars were outscored by 46 points on Sunday, the most lopsided defeat in team history but arguably just their second-worst loss of the year. In March, a former financial manager was sentenced to more than six years in prison for stealing more than $22 million from the NFL club.

Prosecutors said Amit Patel, who was a financial manager for the team, skimmed money by inflating hotel, airfare, catering and other expenses for at least three years. Patel pleaded guilty and said he stole to fuel alcohol and gambling addictions.

Auditors say financial pressures—including addictions, divorces and medical bills—sometimes drive otherwise-decent people to cheat the system.

"For most people, the one place you go where you have access to somebody else's stuff is your place of work," says John Warren, chief executive of the Association of Certified Fraud Examiners. "If I'm a normal Joe Blow and I need money, I'm not going to go rob a bank."

People often rationalize stealing from a business as less harmful than taking from another person, Warren adds. They also tend to sneak through fake expenses in small increments, which delays detection. Uncovering an expense-fraud scheme typically takes 12 to 18 months, he says.

John Toman, co-founder and chief product officer of financial software maker Pivot Payables, says a new client in the construction industry recently discovered a longtime, trusted employee stole about $120,000 over several years by padding expenses. The employee would buy supplies at a home-improvement store, throwing a $500 gift card into the shopping cart for himself.

More employees are doctoring receipts, auditors say. For instance, they manipulate screenshots to make a client dinner for two look like dinner for five, altering prices and adding line items. Toman says Pivot Payables may soon be able to catch that. The company has a database of over 100,000 merchants' receipts, so it knows what a genuine one looks like. Using artificial intelligence and machine learning, the company is running trials to suss out such manipulation that isn't discernible to the human eye.

Toman's company has also developed virtual corporate credit cards that reduce fraudulent expenses by configuring them for use at certain merchants within certain hours and with predefined spending limits, adding an extra layer of security and control. Sharp-eyed accountants are often too late to save businesses from losses.

"Even if you find fraud, it's after the fact," Toman says. "The damage is done."

*Credit goes to Callum Borchers and Lynn Cook, published in the Wall Street Journal, November 20, 2024*

Thank you for all of your questions, comments and suggestions for future topics. As always, they are much appreciated. We also welcome and appreciate anyone who wishes to write a Tax Tip of the Week for our consideration. We may be reached in our Dayton office at 937-436-3133 or in our Xenia office at 937-372-3504. Or, visit our website.

*This Week's Author, Mark Bradstreet*

**Screen Captures of a Reproduction of The Wall Street Journal Article "Strippers, Christmas Gifts and an RV: Workers Push It With Company Cards" on the "Tax Tips" Portion of Bradstreet & Co.'s Website**
(https://web.archive.org/web/20250214160001/https://www.bradstreetcpas.com/blog/christmas-gifts-and-an-rvnbsp-workers-push-it-with-company-cards)
*Captured via web.archive.org on February 14, 2025*

36. In connection with the provision of such services, Bradstreet & Co. also owns and operates a social media account on X (formerly known as Twitter) by the name of bradstreetcpas (@Bradstreet_CPAs) available at https://x.com/Bradstreet_CPAs.

37. Through its X account, Bradstreet & Co. also regularly posted links to news-related articles and information directed to its past, present, and prospective clients, affiliates, and any other members of the public who navigate to its X account. As illustrated in the example webpage capture reproduced below, during the time period relevant to this action, Bradstreet & Co. has posted such articles to its X account timeline:




**Screen Capture of the Bradstreet CPA X (@Bradstreet_CPAs) Timeline**
(https://x.com/Bradstreet_CPAs)
*Captured on September 2, 2026*

38. Specifically, those links direct Bradstreet & Co.'s past, present, and prospective clients, affiliates, and any other members of the public who click on them to articles believed to be hosted on a MailChimp archive owned or operated by Bradstreet & Co.

39. MailChimp is an email marketing and newsletter distribution platform; its

"archive" feature creates a publicly accessible webpage for each email campaign, allowing anyone with the link to view the content of a past newsletter. Thus, in addition to distributing Dow Jones's Copyrighted Works directly to email subscribers via its newsletter, Bradstreet & Co. also made those same works available to the general public through the MailChimp Archive's web-hosted pages, which functioned as a separate channel of distribution distinct from Bradstreet & Co's own website.

40. As illustrated in the example webpage capture reproduced below, when a client clicks on the link in the February 4 post on Bradstreet & Co.'s X account, the link directs the client to the webpage below, which is a full reproduction of a Dow Jones's Copyrighted Work:



8/14/26, 10:33 AM The Clock Is Ticking for IRA Inheritors to Take Distributions

Subscribe | Past Issues | Translate | RSS

TAX TIP OF THE WEEK
Timely, relevant bursts of tax nuggets

Tax Tip of the Week | February 4, 2026 |The Clock Is Ticking for IRA Inheritors to Take Distributions

This Week's Quote:

"A little progress each day adds up to big results."
—Satya Nani

When his wife, Kathy, inherited a $246,000 traditional individual retirement account from her mother last year, Brian Creighton said they felt blessed and wanted to be good stewards of the money.

The Creightons soon learned they had a deadline to deplete the account.

The Internal Revenue Service issued final guidance last year that requires many people who inherited IRAs in recent years to take their first required minimum distributions by Dec. 31. For taxpayers in their working years such as the Creightons, both 54, that can mean a big tax hit. Distributions from inherited traditional IRAs count as income, and can move people into a higher tax bracket.

Under the new rules, most people who inherited accounts in 2020 or later, other than spouses, have to take the money out within 10 years, starting the year after the original IRA owner's death. Those who inherited from someone who was taking required payouts, such as Kathy Creighton, have to take annual minimum payouts in years one through nine, and empty the account in year 10.

The IRS had delayed enforcing the annual payouts until this year.

People who inherited before 2020 can use the old rules, which allow beneficiaries to stretch out distributions over their lifetimes, lessening the tax hit.

The Creightons are on top of the rules, but many inheritors are failing to take required distributions, not

**Need a Tax Planning Meeting?**

TIME TO PLAN

Email to setup time...

**Need QuickBooks Training?**

QuickBooks

Email to setup time...

**Upcoming Webinars:**

Click to register...

SEMINAR

**About Bradstreet CPAs:**

Business owners, CFOs, controllers, and individuals trust Bradstreet & Company for our tax expertise and business acumen to provide the best tax outcomes and to avoid tax missteps. With offices in Dayton and Xenia, OH, we provide accounting and business consulting to firms and individuals throughout the region. Learn more about our team: Bradstreet Bios.

**About Our "Tax Tip of the Week" Series**

We understand how difficult and frustrating the tax code can be. Bradstreet & Company created the "Tax Tip of the Week" to serve-up weekly

https://us1.campaign-archive.com/?u=80b4ad203b3ae38a5bd91d212&id=985cc1d1b9 1/3

**Screen Capture of the February 4, 2026 X Account Webpage Link Result**
(https://us1.campaign-archive.com/?u=80b4ad203b3ae38a5bd91d212&id=985cc1d1b9)
*Captured on August 14, 2026*

41. From the above-illustrated webpage, through the "Past Issues" tab, past, present, and prospective clients, affiliates, and any other members of the public can access a backlog of articles, many of which are full reproductions of Dow Jones's Copyrighted Works, as illustrated in the example webpage capture reproduced below:

8/14/26, 10:40 AM Bradstreet & Company, Inc.

TAX TIP OF THE WEEK

*Timely, relevant bursts of tax nuggets*

**Email Campaign Archive**

from Bradstreet & Company, Inc.

join our mailing list

- 06/13/2026 - Welcome to the Bradstreet tax tip sharing community
- 03/11/2026 - Why Every Family Should Hold a Quarterly Money Meeting
- 02/25/2026 - The Hardest Part About Being a Billionaire in California: Proving You Left
- 02/18/2026 - An Underused Tax-Free Investment Account Amps Up in the New Year
- 02/11/2026 - The Medicare Charge That's Taking a Bigger Bite Out of Social Security Checks
- 02/04/2026 - The Clock Is Ticking for IRA Inheritors to Take Distributions
- 01/28/2026 - The Top 10 Reasons New Businesses Fail
- 01/21/2026 - How AI Is Making Life Easier for Cybercriminals
- 01/14/2026 - Why Every Family Needs a Code Word
- 01/07/2026 - The Surprising (and Reassuring) Truth About Late Presents
- 12/31/2025 - Happy New Year from Bradstreet & Company!!
- 12/24/2025 - Special Holiday Edition: A Heartfelt Message from Bradstreet & Company
- 12/17/2025 - High Earners Age 50 and Older Are About to Lose a Major 401(k) Tax Break
- 12/10/2025 - Five Ideas for Helping Solve America's Student-Loan Problem
- 12/03/2025 - Do You Need a Personal Cybersecurity Concierge?
- 11/26/2025 - Leaving the Wrong Beneficiary on Your IRA Plan Can Be a Costly Mistake
- 11/19/2025 - Her Husband Died Unexpectedly. She Spent a Year Untangling Their Finances.
- 11/12/2025 - The New Age of Entrepreneurship: 70 to 79
- 11/05/2025 - Ohio Department of Taxation Warns of New Text Message Scam
- 10/29/2025 - Tax Breaks Available for Caregivers

https://us1.campaign-archive.com/home/?u=80b4ad203b3ae38a5bd91d212&id=60b03137d3 1/1

.

**Screen Capture of the "Email Campaign Archive from Bradstreet & Company, Inc."**
(https://us1.campaign-archive.com/home/?u=80b4ad203b3ae38a5bd91d212&id=60b03137d3)
*Captured on August 14, 2026*

42. Additionally, in connection with the provision of such services, Bradstreet & Co. owns and operates a social media account on Facebook under the name of Bradstreet CPAs, available at https://www.facebook.com/bradstreetcpas/.

43. Through its Facebook account, Bradstreet & Co. also regularly posted links to news-related articles and information directed to its past, present, and prospective clients,

affiliates, and any other members of the public who navigate to its Facebook page. As illustrated in the example webpage capture reproduced below, during the time period relevant to this action, Bradstreet & Co. has posted such articles to its Facebook page:




**Screen Capture of the Bradstreet CPAs Facebook Page**
(https://www.facebook.com/bradstreetcpas/)
*Captured on August 11, 2026*

44. Similar to the Bradstreet & Co. X posts, those links direct Bradstreet &

Co.'s past, present, and prospective clients, affiliates, and any other members of the public who click on them to the articles, which are also full reproductions of Dow Jones's Copyrighted Works, hosted on the MailChimp archive owned or operated by Bradstreet & Co.

45. Upon information and belief, in connection with the provision of such services, during the time period relevant to this action, Bradstreet & Co. also owned and operated a social media account on LinkedIn under the page name Bradstreet & Company, Inc. CPAs at https://www.linkedin.com/company/bradstreet-&-company-inc.-cpas/about/. According to LinkedIn, the "page… no longer exists."

46. However, upon information and belief, Bradstreet & Co. also regularly posted links to news-related articles and information directed to its past, present, and prospective clients, affiliates, and any other members of the public who navigated to its LinkedIn page, which directed individuals to full reproductions of Dow Jones's Copyrighted Works on Bradstreet & Co.'s website and/or Mailchimp archive.

47. Upon information and belief, during the time period relevant to this action, Bradstreet & Co. also used an email listserv to distribute emails on an approximately weekly basis to approximately **10,000** contacts, consisting largely of past, present, and prospective clients, that contained links to full reproductions of Dow Jones's Copyrighted Works on Bradstreet & Co.'s website and/or Mailchimp archive.

48. Bradstreet & Co. used and uses its Online Platforms to advertise its services and gains commercial and financial benefit from the interaction of members of the public—including its past, present, and prospective clients—with its Online Platforms.

49. Dow Jones has confirmed that Mr. Bradstreet, founder and owner of Bradstreet & Co., obtained at least two consumer subscriptions to WSJ.com with an @bradstreetcpas.com email address and agreed to the WSJ Terms of Use.

50. Dow Jones has also confirmed that at least one other individual with an @bradstreetcpas.com email address who, upon information and belief, is affiliated with Bradstreet & Co. and/or otherwise under the direction or control of Bradstreet & Co., also subscribed to WSJ.com and agreed to the WSJ Terms of Use.

51. By agreeing to the WSJ Terms of Use, Bradstreet & Co., Mr. Bradstreet, and/or the other affiliated individual(s) agreed to various limits on their use of Dow Jones's Copyrighted Works, including that they do not have the right to "use, sell, publish, distribute, retransmit or otherwise provide access to" Dow Jones's Copyrighted Works to anyone. See Ex. D at § 8.2.

52. By agreeing to the WSJ Terms of Use, Bradstreet & Co., Mr. Bradstreet, and/or the other affiliated individual(s) also expressly agreed that their limited rights do not permit use of WSJ.com in order to "regularly provide others with access to" Dow Jones's Copyrighted Works. See Ex. D at § 8.2.2.

53. By agreeing to the WSJ Terms of Use, Bradstreet & Co., Mr. Bradstreet, and/or the other affiliated individual(s) also expressly agreed that their limited rights only allow Dow Jones's Copyrighted Works to be downloaded and stored for individual, non-commercial use and, with limited exceptions, must not "otherwise provide access to [Dow Jones's Copyrighted Works] to anyone." See Ex. D at §§ 8.1, 8.2, 8.2.3, 8.3.3.

54. Between at least 2019 and 2026, Defendants willfully reproduced, on Bradstreet & Co.'s Online Platforms, approximately 79 of Dow Jones's Copyrighted Works, in full, without permission or a license from Dow Jones. See, e.g., Ex. B.

55. Examples of Defendants' reproduction of Dow Jones's Copyrighted Works include, but are by no means limited to: (1) The Wall Street Journal's January 24, 2026 article titled "The Hardest Part About Being a Billionaire in California: Proving You Left"; (2) The Wall Street Journal's December 22, 2025 article titled "An Underused Tax-Free Investment Account Amps Up in the New Year"; (3) The Wall Street Journal's January 23, 2026 article titled "The Medicare Charge That's Taking a Bigger Bite Out of Social Security Checks"; and (4) The Wall Street Journal's September 25, 2025 article titled "High Earners Age 50 and Older Are About to Lose a Major 401(k) Tax Break." See Ex. E, Ex. F, Ex. G, and Ex. H.

56. In reproducing Dow Jones's Copyrighted Works on its Online Platforms, Bradstreet & Co. regularly and systematically copied the exact text and headlines from The Wall Street Journal's original articles without permission or a license.

57. Defendants added no new analysis or commentary that would transform the meaning or message of Dow Jones's Copyrighted Works. Instead, each reproduced article consisted entirely of verbatim Dow Jones content, followed by Bradstreet & Co.'s own office contact information and a designation of Mr. Bradstreet (or occasionally other Bradstreet & Co. employees) as "This Week's Author." See, e.g., Ex. E.

Thank you for all of your questions, comments and suggestions for future topics. As always, they are much appreciated. We also welcome and appreciate anyone who wishes to write a Tax Tip of the Week for our consideration. We may be reached in our Dayton office at 937-436-3133 or in our Xenia office at 937-372-3504. Or, visit our website.

*This Week's Author, Mark Bradstreet*

-until next week

58. Examples of certain of The Wall Street Journal's original articles (as they appear on WSJ.com) and Bradstreet & Co.'s full reproductions thereof are illustrated in the paragraphs below.

59. In the first example shown below, attached as **Exhibit E**, Bradstreet & Co. copied the exact text and main headline from The Wall Street Journal's January 24, 2026 article titled "The Hardest Part About Being a Billionaire in California: Proving You Left," which was reproduced on Bradstreet & Co.'s MailChimp archive (accessible through links on all of its Online Platforms) on or around February 25, 2026.




# Tax Tip of the Week | February 25, 2026 |The Hardest Part About Being a Billionaire in California: Proving You Left




This Week's Quote:

"You can't have a million dollar dream with a minimum wage work ethic."
—Zig Ziglar

A proposed billionaire tax has some of the richest Californians eyeing the exits. First they'll have to contend with the state's dogged tax collectors.

California has one of the nation's highest personal income-tax rates on high earners. It's also home to officials who pore through phone logs, look for country-club memberships and even double-check visits to the dentist—all to figure out what really functions as home.

This can be a tricky question. The superwealthy might have a house in the Bay Area or the Hollywood Hills, but also spend time in a Paris apartment, a Florida compound or a yacht off the coast of Greece.

Also, California has few hard-and-fast rules on residency. Tax advisers say you're generally considered a resident if California is your "domicile"—a true home base to which you plan to return. A person domiciled in California who spends time elsewhere is sometimes still expected to pay state income taxes.

"If you leave, you really have to leave," said Steven Toscher, managing principal of Hochman Salkin Toscher Perez, a Beverly Hills law firm that advises clients on navigating California residency.

Advisers generally recommend that people who want to avoid California's tax net limit their visits and keep clear records of their purpose and duration.

**Need a Tax Planning Meeting?**




Email to setup time...

**Need QuickBooks Training?**

QuickBooks

Email to setup time...

**Upcoming Webinars:**

Click to register...




**About Bradstreet CPAs:**

Business owners, CFOs, controllers, and individuals trust Bradstreet & Company for our tax expertise and business acumen to provide the best tax outcomes and to avoid tax missteps. With offices in Dayton and Xenia, OH, we provide accounting and business consulting to firms and individuals throughout the region. Learn more about our team: Bradstreet Bios.

**About Our "Tax Tip of the Week" Series**

We understand how difficult and frustrating the tax code can be. Bradstreet & Company created the "Tax Tip of the

8/14/26, 11:09 AM The Hardest Part About Being a Billionaire in California: Proving You Left - WSJ

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/lifestyle/california-billionaire-tax-income-6d48e22c

LIFESTYLE

## The Hardest Part About Being a Billionaire in California: Proving You Left

Advisers recommend leaving breadcrumbs, like a 'we've moved' note on the Christmas card, and you really do have to quit the country club.

Laura J. Nelson and Juliet Chung
Jan. 24, 2026 8:00 pm ET



Leaving California has become a hot topic among the state's wealthiest residents. JEREMY LEUNG/WSJ, ISTOCK

A proposed billionaire tax has some of the richest Californians eyeing the exits. First they'll have to contend with the state's dogged tax collectors.

California has one of the nation's highest personal income-tax rates on high earners. It's also home to officials who pore through phone logs, look for country-club memberships and even double-check visits to the dentist—all to figure out what really functions as home.

This can be a tricky question. The superwealthy might have a house in the Bay Area or the Hollywood Hills, but also spend time in a Paris apartment, a Florida compound or a yacht off the coast of Greece.

Also, California has few hard-and-fast rules on residency. Tax advisers say you're generally considered a resident if California is your "domicile"—a true home base to which you plan to return. A person domiciled in California who spends time elsewhere is sometimes still expected to pay state income taxes.

"If you leave, you really have to leave," said Steven Toscher, managing principal of Hochman Salkin Toscher Perez, a Beverly Hills law firm that advises clients on navigating California residency.

https://www.wsj.com/lifestyle/california-billionaire-tax-income-6d48e22c 1/5

"The Hardest Part About Being a Billionaire in California: Proving You Left"
**Bradstreet & Co.'s Email Campaign Reproduction vs. Original WSJ.com Article**[2]

60. In the second example shown below, attached as **Exhibit F**, Bradstreet & Co. copied the exact text and main headline from The Wall Street Journal's December 22, 2025

---

[2] Compare Bradstreet's reproduction (https://us1.campaign-archive.com/?u=80b4ad203b3ae38a5bd91d212&id=d1e85b72b7 [last visited August 14, 2026]) with the original WSJ.com article (https://www.wsj.com/lifestyle/california-billionaire-tax-income-6d48e22c [last visited August 14, 2026]). Exhibit E includes full versions of both Bradstreet's reproduction and the original WSJ.com article.

article titled "An Underused Tax-Free Investment Account Amps Up in the New Year," which was reproduced on Bradstreet & Co.'s MailChimp archive (accessible through links on all of its Online Platforms) on or around February 18, 2026.

8/14/26, 10:58 AM An Underused Tax-Free Investment Account Amps Up in the New Year

Subscribe | Past Issues | Translate ▾ | RSS




# Tax Tip of the Week | February 18, 2026 |An Underused Tax-Free Investment Account Amps Up in the New Year




This Week's Quote:

**"In a world where you can be anything, be kind." —Jennifer Dukes Lee"**

A powerful tax-free investment option for people with disabilities is misunderstood and underused. That could change in the new year.

On Jan. 1, millions more Americans across income levels will be eligible to open what is called an ABLE account.

These accounts let low-income people with disabilities build up savings, without jeopardizing public benefits. But wealthy people with disabilities can use the accounts too, and save up to hundreds of thousands of dollars in them.

"People hear about it and think it's not for them. They're wrong," said Juliana Crist, head of ABLE programs at Vestwell, which administers accounts in 19 states. She said the average ABLE account balance at Vestwell is nearly $13,000, and the highest is $376,000.

Previously, individuals had to be diagnosed with a disability that began before they turned 26 to be eligible. A law that goes into effect in 2026 raises that to age 46.

**Need a Tax Planning Meeting?**




Email to setup time...

**Need QuickBooks Training?**

QuickBooks

Email to setup time...

**Upcoming Webinars:**

Click to register...




**About Bradstreet CPAs:**

Business owners, CFOs, controllers, and individuals trust Bradstreet & Company for our tax expertise and business acumen to provide the best tax outcomes and to avoid tax missteps. With offices in Dayton and Xenia, OH, we provide accounting and

https://us1.campaign-archive.com/?u=80b4ad203b3ae38a5bd91d212&id=054959ff24 1/4

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/personal-finance/an-underused-tax-free-investment-account-amps-up-in-the-new-year-432041ab

PERSONAL FINANCE Follow

# An Underused Tax-Free Investment Account Amps Up in the New Year

Millions more Americans with disabilities will be eligible to open ABLE accounts starting Jan. 1

By Ashlea Ebeling
Dec. 22, 2025 11:00 am ET



EMIL LENDOF/WSJ, ISTOCK

Quick Summary

- Eligibility for ABLE accounts will expand significantly in 2026, raising the disability onset age from 26 to 46.

View more

A powerful tax-free investment option for people with disabilities is misunderstood and underused. That could change in the new year.

On Jan. 1, millions more Americans across income levels will be eligible to open what is called an ABLE account.

These accounts let low-income people with disabilities build up savings, without jeopardizing public benefits. But wealthy people with disabilities can use the accounts too, and save up to hundreds of thousands of dollars in them.



"An Underused Tax-Free Investment Account Amps Up in the New Year"
**Bradstreet & Co.'s Email Campaign Reproduction vs. Original WSJ.com Article[3]**

[3] Compare Bradstreet's reproduction (https://us1.campaign-archive.com/?u=80b4ad203b3ae38a5bd91d212&id=054959ff24 [last visited August 14, 2026]) with the original WSJ.com article (https://www.wsj.com/personal-finance/an-underused-tax-free-investment-account-amps-up-in-the-new-year-432041ab [last visited August 14, 2026]). Exhibit F includes full versions of both Bradstreet's reproduction and the original WSJ.com article.

61. In the third example shown below, attached as **Exhibit G**, Bradstreet & Co. copied the exact text and main headline from The Wall Street Journal's January 23, 2026 article titled "The Medicare Charge That's Taking a Bigger Bite Out of Social Security Checks," which was reproduced on Bradstreet & Co.'s MailChimp archive (accessible through links on all of its Online Platforms) on or around February 11, 2026.

8/14/26, 11:03 AM The Medicare Charge That's Taking a Bigger Bite Out of Social Security Checks

Subscribe | Past Issues | Translate ▾ | RSS

TAX TIP OF THE WEEK
*Timely, relevant bursts of tax nuggets*

## Tax Tip of the Week | February 11, 2026 |The Medicare Charge That's Taking a Bigger Bite Out of Social Security Checks




This Week's Quote:

"The bad news is time flies. The good news is you're the pilot."
—Michael Alexander

Elaine Young, a 66-year-old widow living near Philadelphia who does her own taxes, is confused and annoyed.

"I got a letter from Social Security congratulating me on my 2.8% cost-of-living inflation adjustment for 2026. But they're taking a third of my payment for Medicare, and this year I'm getting less per month than last year. What's the inflation adjustment for Medicare premiums?" she asks.

Good question, Ms. Young. Other seniors are likely asking it as they see the rising cost of Medicare Part B premiums (for doctors and outpatient care) and Part D premiums (for drugs) reduce their own Social Security payments. This is especially true for those who, like Young, are affluent and owe charges called "income-related monthly adjustment amounts," or Irmaa.

What gives? The short answer is that Social Security payments are income that's adjusted for inflation. Medicare premiums are determined by overall medical costs and are subtracted from your Social Security payments. But there is a further subtraction for Irmaa, if your income exceeds certain thresholds.

And Irmaa leads to a longer, more complex answer. It's increasingly important because Medicare Irmaa charges for about six million, higher-earning Americans today are projected to rise significantly. According to the 2025 Medicare Trustees Report, overall Part B Irmaa charges alone are expected to increase 30% from 2026 to 2030.

Originally, Congress intended Medicare recipients to bear 25% of its costs through premiums that are adjusted annually, with the other 75% coming from government revenues.

**Need a Tax Planning Meeting?**




Email to setup time...

**Need QuickBooks Training?**

QuickBooks

Email to setup time...

**Upcoming Webinars:**

Click to register...




**About Bradstreet CPAs:**

Business owners, CFOs, controllers,

https://us1.campaign-archive.com/?u=80b4ad203b3ae38a5bd91d212&id=ef9eacc948 1/4

8/14/26, 11:12 AM The Medicare Charge That's Taking a Bigger Bite Out of Social Security Checks - WSJ

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/personal-finance/taxes/what-is-irmaa-medicare-social-security-c7e2860a

PERSONAL FINANCE • TAXES • TAX REPORT

# The Medicare Charge That's Taking a Bigger Bite Out of Social Security Checks

Nearly six million seniors owe extra Medicare premiums called Irmaa, and these charges are set to rise



By Laura Saunders
Jan. 23, 2026 5:30 am ET



KIERSTEN ESSENPREIS

Elaine Young, a 66-year-old widow living near Philadelphia who does her own taxes, is confused and annoyed.

"I got a letter from Social Security congratulating me on my 2.8% cost-of-living inflation adjustment for 2026. But they're taking a third of my payment for Medicare, and this year I'm getting less per month than last year. What's the inflation adjustment for Medicare premiums?" she asks.

Good question, Ms. Young. Other seniors are likely asking it as they see the rising cost of Medicare Part B premiums (for doctors and outpatient care) and Part D premiums (for drugs) reduce their own Social Security payments. This is especially true for those who, like Young, are affluent and owe charges called "income-related monthly adjustment amounts," or Irmaa.

https://www.wsj.com/personal-finance/taxes/what-is-irmaa-medicare-social-security-c7e2860a 1/6

"The Medicare Charge That's Taking a Bigger Bite Out of Social Security Checks"
**Bradstreet & Co.'s Email Campaign Reproduction vs. Original WSJ.com Article**[4]

[4] Compare Bradstreet's reproduction (https://us1.campaign-archive.com/?u=80b4ad203b3ae38a5bd91d212&id=ef9eacc948 [last visited August 14, 2026]) with the original WSJ.com article (https://www.wsj.com/personal-finance/taxes/what-is-irmaa-medicare-social-security-c7e2860a [last visited August 14, 2026]). Exhibit G includes full versions of both Bradstreet's reproduction and the original WSJ.com article.

62. In the fourth example shown below, attached as **Exhibit H**, Bradstreet & Co. copied the exact text and main headline from The Wall Street Journal's September 25, 2025 article titled “High Earners Age 50 and Older Are About to Lose a Major 401(k) Tax Break," which was reproduced on Bradstreet & Co.'s website on or around December 17, 2025.

8/13/26, 9:51 AM High Earners Age 50 and Older Are About to Lose a Major 401(k) Tax Break — Bradstreet & Company

BRADSTREET & COMPANY, INC. ABOUT SERVICES RESOURCES INDUSTRIES TAX TIPS CAREERS PAYMENT PORTAL CLIENT LOGIN

## High Earners Age 50 and Older Are About to Lose a Major 401(k) Tax Break

401(k) High earner | Taxes | Retirement December 17, 2025




This Week's Quote:

"A truly happy person is one who can enjoy the scenery while on a detour."
- Unknown

One of the biggest retirement-saving perks for workers age 50 and older is about to get new restrictions.

Starting next year, the extra catch-up contributions that those workers use to stow money in their 401(k)s will have to go into their accounts after tax for high earners. The Internal Revenue Service issued final rules this month on a 2022 law, which set the threshold for a high earner at more than $145,000 in wages.

This change means many workers will pay taxes on their catch-up money upfront during high-earning years instead of in lower-earning years in retirement. The money would go into a Roth account, where it can later be withdrawn tax-free.

https://web.archive.org/web/20251225181628/https://www.bradstreetcpas.com/blog/high-earners-age-50-and-older-are-about-to-lose-a-major-401k-tax-break 1/3

8/14/26, 11:40 AM 401(k) 'Catch-Up' Contributions Face New Roth Rule for High Earners - WSJ

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/personal-finance/retirement/high-earners-age-50-and-older-are-about-to-lose-a-major-401-k-tax-break-75572091

PERSONAL FINANCE • RETIREMENT Follow

# High Earners Age 50 and Older Are About to Lose a Major 401(k) Tax Break

The option to make pretax catch-up retirement contributions is going away for those savers

By Ashlea Ebeling
Sept. 24, 2025 5:30 am ET



The Washington, D.C., home of the IRS, which has issued final rules on a law mandating Roth 401(k) savings for the first time. ANNABELLE GORDON/REUTERS

Quick Summary

- Starting next year, workers age 50 and older who earn over $145,000 must make their 401(k) catch-up contributions after tax.

View more

One of the biggest retirement-saving perks for workers age 50 and older is about to get new restrictions.

Starting next year, the extra catch-up contributions that those workers use to stow money in their 401(k)s will have to go into their accounts after tax for high earners. The Internal Revenue Service issued final rules this month on a 2022 law, which set the threshold for a high earner at more than $145,000 in wages.

https://www.wsj.com/personal-finance/retirement/high-earners-age-50-and-older-are-about-to-lose-a-major-401-k-tax-break-75572091 1/5

"High Earners Age 50 and Older Are About to Lose a Major 401(k) Tax Break"
**Bradstreet & Co.'s Website Reproduction vs. Original WSJ.com Article[5]**

---

[5] Compare Bradstreet's reproduction (https://web.archive.org/web/20251225181628/https://www.bradstreetcpas.com/blog/high-earners-age-50-and-older-are-about-to-lose-a-major-401k-tax-break [last visited August 13, 2026]) with the original WSJ.com article (https://www.wsj.com/personal-finance/retirement/high-earners-age-50-and-older-are-about-to-lose-a-major-401-k-tax-break-75572091 [last visited August 14, 2026]). Exhibit H includes full versions of both Bradstreet's reproduction and the original WSJ.com article.

63. Bradstreet & Co. directly benefited from its infringement by misappropriating Dow Jones's Copyrighted Works to attract past, present, and prospective clients to its Online Platforms, promote its own professional services, and enhance its reputation and credibility as a source of expert tax, financial, and business guidance to its past, present, and prospective clients.

64. Specifically, Bradstreet & Co. republished Dow Jones's Copyrighted Works as part of its "Tax Tip of the Week" series, which Bradstreet & Co. promoted to its audience as follows: "We understand how difficult and frustrating the tax code can be. Bradstreet and Company created the Tax Tip of the Week to serve as weekly nuggets of tax tips to help keep you informed and engaged on the latest changes that might impact your taxes."

65. On the same pages where Dow Jones's Copyrighted Works appeared, Bradstreet & Co. displayed links inviting visitors to schedule a tax planning meeting, sign up for QuickBooks training, and register for webinars hosted by Bradstreet & Co., positioning Dow Jones's original journalism directly alongside promotions for Bradstreet & Co.'s own commercial services.

66. By presenting Dow Jones's Copyrighted Works under the "Tax Tip of the Week" banner, surrounding them with its own service offerings, and designating Mr. Bradstreet as "This Week's Author," Bradstreet & Co. held itself out as the source of the content and used Dow Jones's journalism as a vehicle to market its business to past, present, and prospective clients.

67. Dow Jones has compiled a non-exhaustive list of Dow Jones's Copyrighted Works known to have been reproduced without permission or license by Bradstreet & Co. See Ex. B.

68. Dow Jones routinely registers its works with the U.S. Copyright Office and registered each of the specific Dow Jones's Copyrighted Works reproduced by Bradstreet & Co. before or within three months of Bradstreet & Co.'s infringement.

***Dow Jones's Pre-Complaint Correspondence with Bradstreet & Co. Following Discovery of Infringement***

69. Dow Jones diligently monitors for and actively enforces its copyrights against unauthorized use. However, given the nature of Bradstreet & Co.'s infringement, on its own Online Platforms among millions of others online, Dow Jones did not discover and could not, through the exercise of reasonable diligence, have discovered Bradstreet & Co.'s infringement prior to February 2026.

70. Upon discovering Bradstreet & Co.'s unauthorized reproduction of certain of Dow Jones's Copyrighted Works in February 2026, Dow Jones promptly sent a cease-and-desist letter, on February 24, 2026, to Bradstreet & Co. identifying Dow Jones's relevant copyright protection and noting specific examples of Bradstreet & Co.'s infringement of Dow Jones's Copyrighted Works. Dow Jones's cease-and-desist letter expressly objected to Bradstreet & Co.'s present and continued unauthorized reproduction and online distribution of Dow Jones's Copyrighted Works and further requested information necessary to calculate or otherwise quantify damages arising from the infringement.

71. Although Dow Jones captured and preserved specific examples of Defendants' infringement of Dow Jones's Copyrighted Works, upon information and belief, Defendants have infringed many additional Dow Jones's Copyrighted Works.

72. While Bradstreet & Co. appears to have removed at least some reproductions of Dow Jones's Copyrighted Works from its website and completely deleted its LinkedIn page following the February 24, 2026 cease-and-desist letter, some reproductions of Dow Jones's Copyrighted Works remain publicly accessible on Bradstreet & Co.'s Online Platforms months after Bradstreet & Co. represented that it had removed the infringing content. To date, Defendants have not compensated Dow Jones, financially or otherwise, for their willful and repeated infringement of Dow Jones's Copyrighted Works.

## COUNT I: COPYRIGHT INFRINGEMENT

**Against All Defendants**

**(17 U.S.C. § 501 et seq.)**

73. Dow Jones hereby realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

74. Dow Jones is the sole owner of all rights, titles, and interest in and to the copyrights of each of Dow Jones's Copyrighted Works.

75. Dow Jones's Copyrighted Works are literary and visual works consisting of copyrightable subject matter under 17 U.S.C. § 102(a) and are protected under the Copyright Act, 17 U.S.C. § 101 et seq.

76. Dow Jones has obtained thousands of Certificates of Registration with the U.S. Register of Copyrights and has at all times complied with the Copyright Act and all other

laws of the United States regarding Dow Jones's Copyrighted Works.

77. This includes Certificates of Registration for each of Dow Jones's Copyrighted Works. See Ex. B.

78. Pursuant to 17 U.S.C. § 106, Dow Jones has the exclusive right to, inter alia, reproduce, distribute, publicly display, and prepare derivative works from Dow Jones's Copyrighted Works.

79. Defendants have infringed Dow Jones's exclusive rights in Dow Jones's Copyrighted Works under 17 U.S.C. § 106 by unlawfully reproducing, republishing, preparing derivative works of, and distributing Dow Jones's Copyrighted Works without authority or permission from Dow Jones over a period of approximately seven years.

80. Specifically, Mr. Bradstreet, as the founder and owner of Bradstreet & Co., controlled the operations and decisions of Bradstreet & Co. with respect to the reproduction and distribution of Dow Jones's Copyrighted Works, including through its Online Platforms.

81. Mr. Bradstreet personally directed and participated in, had knowledge of, and received a direct financial benefit from the unauthorized reproduction and distribution of Dow Jones's Copyrighted Works, illustrated by the fact that many of the reproduced articles on Bradstreet & Co.'s Online Platforms included a designation of Mr. Bradstreet as "This Week's Author." See Ex. E, Ex. G.

82. Defendants' infringement is and has been willful because Defendants knew under the WSJ Terms of Use that they were prohibited from systematically copying and redistributing content from The Wall Street Journal to approximately ten thousand or more past,

present, and prospective clients, affiliates, and any other members of the public through Bradstreet & Co.'s Online Platforms.

83. Defendants violated Dow Jones's clearly established rights under the Copyright Act, of which a reasonable person would have been aware.

84. Among other things, the Copyright Act protects against the reproduction and distribution of another party's copyrighted work without permission or a license.

85. Defendants did not add any commentary or analysis that would transform the meaning or message of Dow Jones's Copyrighted Works. Instead, Defendants designated Mr. Bradstreet (or occasionally other Bradstreet & Co. employees) as "This Week's Author" at the conclusion of each reproduced article. Although certain reproductions included a small credit line referencing the original Wall Street Journal journalist, Mr. Bradstreet nonetheless held himself out as the article's author to Bradstreet & Co.'s clients and the public.

86. Upon information and belief, in reproducing Dow Jones's Copyrighted Works, Defendants deliberately replaced the original photographs and images accompanying The Wall Street Journal's articles with different images. Defendants' selective substitution of Dow Jones's photographs, while simultaneously copying the full text of the accompanying articles verbatim, demonstrates that Defendants were aware or should have been aware that the content they were reproducing was protected by copyright and that they lacked authorization to republish it. Defendants' decision to remove and replace the photographs while retaining the copyrighted text in its entirety further evidences the willful nature of Defendants' infringement.

87. Upon information and belief, Defendants profited or otherwise benefited

from their infringement of Dow Jones's Copyrighted Works.

88. Upon information and belief, Defendants received recognition, credit, referrals, customers, clients, and goodwill for reproducing and distributing links to Bradstreet & Co's reproduced versions of Dow Jones's Copyrighted Works.

89. Upon information and belief, Defendants deliberately selected Dow Jones's Copyrighted Works that were highly relevant to Bradstreet & Co.'s accounting, tax, and financial advisory practice and to the interests of its past, present, and prospective clients, including articles on tax planning, IRS enforcement, retirement savings, estate planning, Social Security, and wealth management. By offering this curated selection of high-quality Wall Street Journal journalism to its audience free of charge, Bradstreet & Co. attracted past, present, and prospective clients to its Online Platforms, drove engagement with its email listserv of approximately 10,000 contacts, and promoted its professional services.

90. Defendants copied original elements of Dow Jones's Copyrighted Works such as, but not limited to, captions, charts, and text.

91. Defendants harmed the potential market for and value of Dow Jones's Copyrighted Works by directly competing with Dow Jones as a news distributor in the business community and diverting profits from Dow Jones. Dow Jones's publications, including The Wall Street Journal, serve a readership that includes Bradstreet & Co.'s own client base: individuals and businesses seeking guidance on tax planning, retirement, estate planning, and personal finance. By providing these readers with free, unlicensed access to full-text Wall Street Journal articles on these very topics, Defendants directly displaced demand for Dow Jones subscriptions and licensing arrangements. Dow Jones lost the licensing costs required to legally reproduce its

articles and potential subscribers who had no incentive to pay for Dow Jones's Copyrighted Works as Defendants consistently provided them for free on Bradstreet & Co.'s Online Platforms.

92. Upon information and belief, Defendants' verbatim copying and exploitation of Dow Jones's Copyrighted Works—which included original text and other copyrighted materials—was willful, in disregard of, and with indifference to the rights of Dow Jones.

93. Defendants' infringement was not reasonably discoverable by Dow Jones before February 2026.

94. As a direct result of Defendants' infringing conduct, Dow Jones has sustained and will continue to sustain substantial injury, loss, and damages.

95. Dow Jones is entitled to recover actual damages suffered by Dow Jones as a result of the infringement, including lost licensing fees, and Bradstreet & Co.'s gains, profits, and advantages received or otherwise achieved, directly or indirectly, by Defendants that are not taken into account in computing the actual damages in connection with Defendants' illegal reproduction and distribution of Dow Jones's Copyrighted Works and the creation of derivative works under 17 U.S.C. § 504(b).

96. Dow Jones is entitled to recover statutory damages under 17 U.S.C. § 504(c) for Defendants' willful infringement of each of Dow Jones's Copyrighted Works.

97. Dow Jones is entitled to recover reasonable attorney's fees and costs under 17 U.S.C. § 505.

**COUNT II: CONTRIBUTORY COPYRIGHT INFRINGEMENT**

**Against Mark Bradstreet**

**(17 U.S.C. § 501 et seq.)**

98. Dow Jones hereby realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

99. To the extent Mr. Bradstreet is not directly liable for copyright infringement as set forth above, alternatively, Mr. Bradstreet is liable for contributory infringement.

100. Dow Jones is the sole owner of all rights, titles, and interest in and to the copyrights of each of Dow Jones's Copyrighted Works.

101. Bradstreet & Co. copied original elements of Dow Jones's Copyrighted Works such as, but not limited to, captions, charts, and text.

102. As the founder and owner of Bradstreet & Co., and upon information and belief, Mr. Bradstreet knew or should have known that Dow Jones's Copyrighted Works were protected by copyright and that Bradstreet & Co.'s reproduction and distribution of those works infringed on Dow Jones's copyrights.

103. Among other things, Mr. Bradstreet subscribed to WSJ.com using an @bradstreetcpas.com email address and agreed to the WSJ Terms of Use, which expressly prohibited the unauthorized reproduction, distribution, and republication of Dow Jones's Copyrighted Works. The copyrighted articles themselves also contained express notices of Dow Jones's copyright protections.

104. With knowledge of the infringing activity, Mr. Bradstreet knowingly contributed to, induced, caused, or encouraged the infringement by providing the means, resources, and support for Bradstreet & Co.'s unauthorized reproduction and distribution of Dow Jones's Copyrighted Works, including personal use of his paid WSJ.com subscription to access articles behind The Wall Street Journal's paywall, copying the full text of those articles, and directing their republication on Bradstreet & Co.'s Online Platforms.

105. Mr. Bradstreet's contributory infringement was willful, in disregard of, and with indifference to the rights of Dow Jones.

106. As a direct result of Mr. Bradstreet's contributory infringement, Dow Jones has sustained and will continue to sustain substantial injury, loss, and damages.

**COUNT III: VICARIOUS COPYRIGHT INFRINGEMENT**

**Against Mark Bradstreet**

**(17 U.S.C. § 501 et seq.)**

107. Dow Jones hereby realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

108. To the extent Mr. Bradstreet is not directly liable for copyright infringement as set forth above, alternatively, Mr. Bradstreet is liable for vicarious infringement.

109. Dow Jones is the sole owner of all rights, titles, and interest in and to the copyrights of each of Dow Jones's Copyrighted Works.

110. Bradstreet & Co. copied original elements of Dow Jones's Copyrighted Works such as, but not limited to, captions, charts, and text.

111. As the founder and owner of Bradstreet & Co., and upon information and belief, Mr. Bradstreet had a direct financial interest in the infringing activity.

112. Upon information and belief, by reproducing Dow Jones's Copyrighted Works on Bradstreet & Co.'s Online Platforms (including its 10,000-person email listserv), Mr. Bradstreet attracted past, present, and prospective clients to Bradstreet & Co., promoted its professional services, and enhanced its reputation and credibility as a source of expert tax, financial, and business guidance, all of which directly financially benefited Mr. Bradstreet as an owner of Bradstreet & Co.

113. As the founder and owner of Bradstreet & Co., and upon information and belief, Mark Bradstreet had the right and ability to supervise the infringing activity of Bradstreet & Co. and its employees, including the selection, reproduction, and distribution of Dow Jones's Copyrighted Works on Bradstreet & Co.'s Online Platforms.

114. Despite his right and ability to do so, Mark Bradstreet either failed or refused to stop Bradstreet & Co.'s unauthorized reproduction and distribution of Dow Jones's Copyrighted Works.

115. Mark Bradstreet's vicarious infringement was willful, in disregard of, and with indifference to the rights of Dow Jones.

116. As a direct result of Mark Bradstreet's vicarious infringement, Dow Jones has sustained and will continue to sustain substantial injury, loss, and damages.

## PRAYER FOR RELIEF

WHEREFORE, Dow Jones requests this Court:

A. Enter judgment against Defendants finding Defendants liable for the infringement of Dow Jones's Copyrighted Works;

B. Enter judgment against Mr. Bradstreet finding him liable for the contributory and vicarious infringement of Dow Jones's Copyrighted Works;

C. Issue preliminary and permanent injunctions prohibiting Defendants and each of their agents, servants, employees, attorneys, and any other persons who are in active concert or participation with Defendants from further infringing any of Dow Jones's Copyrighted Works through reproduction on Bradstreet & Co.'s Online Platforms or otherwise;

D. Order Defendants to account for and pay to Dow Jones all profits derived due to the acts alleged in this Complaint and to disgorge such profits to Dow Jones;

E. Award Dow Jones its actual damages sustained as a result of Defendants' actions including, without limitation, damages to Dow Jones's business, reputation, and goodwill and the loss of sales and profits, including licensing fees, that Dow Jones would have made but for Defendants' acts under 17 U.S.C. § 504(b);

F. If Dow Jones elects, award Dow Jones statutory damages to be paid by Defendants pursuant to 17 U.S.C. § 504(c);

G. Award Dow Jones its reasonable attorney fees and costs of this action pursuant to 17 U.S.C. § 505;

H. Award Dow Jones its prejudgment and post-judgment interest on any damages awarded as a result of Defendants' infringement; and

I. Award Dow Jones any such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Dow Jones hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

/s/ John C. Greiner
John C. Greiner (0005551)
Trial Attorney
Ethan K. Losier (0101129)
FARUKI PLL
201 East Fifth Street, Suite 1420
Cincinnati, OH 45202
Telephone: (513) 632-0315
Fax: (513) 632-0319
Email: jgreiner@ficlaw.com
elosier@ficlaw.com

*Counsel for Plaintiff Dow Jones & Company, Inc.*

4930-2354-9914.2